Good morning your honors. May it please the court, Jeffrey Lyon for plaintiff appellant Lisa Carter. And your honors, the main issue in the case is whether or not Ms. Carter had right to reinstatement after she came back, was ready to return to work from disability leave. And the the standard is if the functions of her job that she's entitled to get her job back. And the person designated most knowledgeable by RBC regarding the reasons for Ms. Carter's termination, Marie Campion, the HR representative, was asked in deposition, do you have any specific information that if Carter had not gone out on disability her position would have been eliminated anyway? And the answer was no. So if she hadn't gone out on disability the position still would have existed and therefore she, the only reason she did. Isn't that kind of a but for? I mean what happened when she went out, and I think she may have overstayed her original period of, projected period of leave, was that the work that she was doing was sort of spread out between three other people and then they decided that they really didn't need her. So it's true in a but for sense, maybe they might not have laid her off if she was still there, but when she left as a consequence of her leaving they simply, it became apparent to them that three people, whatever it was, could do the work of four. And isn't that really what's happened to her? Well, when she left, her duties were not simply absorbed by the same number of hours by the people that worked there. The PMK testified that Paul Seifert's hours, in order to take over the duties of Ms. Carter, increased from 20 to 30 to 35 hours per week. At the time he took over her duties in January of 09. Then he retired in September of 09, and he was replaced by a full-time person, Ms. Early, who took over his duties. And so they did need additional person hours to cover Ms. Carter's, Ms. Carter's duties. So it's still cheaper for the employer to work with three, even if he has to give the third one additional hours, short of time and a half? Well, the standard, if there's just a little additional expense to the employer of protecting the employee's job, the employee is still entitled to reinstatement when they're ready to come back. The standard is a hardship. Is it when they're ready to come back, or when they've agreed to come back? She had agreed to come back on a certain date, and then she decided to stay longer, didn't she? Isn't that what this record shows? I think her disability was extended, but it was protected by a doctor's note, and the law under Jensen v. Wells Fargo generally protects the employee's job for at least a year in a large corporation, especially where the policy is to protect the job for a year. Do you have a case that's similar to this, where the work was really absorbed by others? Well, not offhand, not from memory. The standard, though, is hardship, and where an employee, I think even in Jensen Wells Fargo, they have to fill in for the employee on a temporary basis, and again, it was not absorbed by the others. It was absorbed by increasing the hours of Mr. Seifert, and then when he left, he was replaced by a full-time other person, and the standard is hardship, not merely to save money. Otherwise, any person who went out on disability could be replaced. They could just have their duties absorbed by other people who were there by increasing their hours, and then down the road, you could just replace them. According to you, they increased the hours by 15 hours, as opposed to what would have been a full-time position during a period of time when they were in the midst of a cost containment initiative. I mean, I don't see that showing discrimination. Well, there was some testimony that there was cost containment, but no one could identify any document reflecting any plan to control costs. No one could identify anyone having said, we need to control payroll costs. There was no document indicating there was a hiring freeze, and the Beverly Hills branch where she worked became responsible for overseeing three additional branches during that 2009 period, and the overall employment in the Beverly Hills branch and the branches it was overseeing, they acknowledged it never went down. The total number of employees never went down, so the total amount of work was increasing. No one could identify any expense that reduced from quarter to quarter, any revenues that reduced from quarter to quarter. It was just asserted, this is why she was terminated. And they didn't, you know, almost any job, you could take a 40-hour employee in a large corporation, and if they go out on disability, you could terminate them, and then get someone else to work an extra 15 hours a week, and then just distribute their work. According to the facts of this case, her job remained open for a period of time, for the period of time that she said she would be gone, didn't it? On this record? Yeah, Mr. Seifer came in and was, I believe he thought he was filling in temporarily until they didn't bring her back, and the HR representative, the PMK, you know, was asked, well, if Carter's position, you know, was still open at the time that, had reopened at some point, would she have gotten a job back? The answer was no. The answer was no. So even if... Is that the question? Wasn't the question, if she had remained, would you have declared open? Isn't that what the record shows? Not the particular question I'm referring to. The question was, do you have any information that if Carter's position had reopened prior to the expiration of the 12th month, she would have gotten her job back? Answer, no. I see. So, you know, and then I asked the same PMK, isn't it true that if someone's out for, let's say, nine months, and their position still exists, and they're out on disability, do they get their job back? And the HR PMK said, not necessarily. It depends on business conditions. But that's not the law. The law is if the position is still open, and the person goes out on disability, they're entitled to that position back unless the employer can show a hardship. And the additional expense of hiring a temporary employee, a greater expense to fill in for the disabled employee until they get back, although it's a greater expense, and the business has to incur the expense, it's not a hardship. They have to incur some additional expense. I know I'm having trouble with the notion that somebody, that one of the employees had to work 15 hours longer than otherwise would have worked in order to do all of the work that she did for a full-time position. No, it was split up among three employees. When I asked for the split among three, you said, well, there was one that was increased by 15 hours. I mean, you can have it any way you want. Whether one was increased by 15 hours or they were able to split it among the three, the basic fact is that they could have easily decided, well, what do we need another full-time person here? We were able to do the work without her. Well, that would be the truth in virtually any case of a disabled employee. If an employer wanted to replace disabled employees and every single time someone went out, you could replace one person's job with three other people. I mean, this was processing. It just opens the door for an employer to increase the workload on the non-disabled employees, and the employer never would have eliminated the position had she not gone out on disability. And the standard is if the position – the employer's burden is to show that the position would have been eliminated even if the person had not gone out on disability. So the employer would not have done this cost analysis so it can get some number of other people to do the work of the disabled person unless she had gone out on disability. It doesn't matter, though, that they didn't do it immediately when she went out on disability, that she went out on disability expecting to return on a day certain. The day certain came and she hadn't returned. In that window, was her job open or was it not on this record? Well, according to the HR rep, in this specific circumstance, no, because the PMK, regarding the reasons for termination, said even if the job had remained open, she had no information Carter would have gotten her job back. So, you know, and I asked – and then the follow-up, the very next question was, well, let's say someone's out on – you know, exceeds their FMLA 12-week protected disability and they're out for nine months of disability and their job is still – the position is still open when they're ready to return. Are they entitled to get their job back? And the answer was, well, it depends on the business circumstances. That simply isn't the law. I mean, it shows that HR was applying a standard to Ms. Carter that was not the legal standard. Well, why isn't it the law? I understand that there's a 12-week period during which the job is simply protected, but after the 12 weeks, she's got to show discrimination, isn't that right? Or am I misunderstanding? I think you have to show discrimination either way, but yes, that's correct. So, but in any event, we're after the – we're talking about the period after 12 weeks. And if it's a bona fide non-protectual reason, that's to say, you know, we just – I'm not asking you to concede that that's the facts here, but the company's cut its workforce in half. And they say, listen, we just don't have that job anymore. That doesn't – and if it's a bona fide reason, she loses. Now, so the question is what happened here, right? Correct. So you look at what did the company actually do. They increased the number of hours of Seifert. Seifert then retires. He's replaced by Early. They don't invite Ms. Carter to come back to work. They have to invite her back to work within a reasonable period of time. Give me the time sequence between Early coming on to fill the position and her saying, I'm coming back or I would like to come back. Which happens first? Carter says she's ready to come back in January, Early isn't hired until September when Seifert retires. So Seifert fills in for Carter by increasing his hours while Carter's out. He stays doing her work when it turns out she's not going to be allowed back at all from January through September. Seifert retires in September and he's replaced by a completely new hire. And Carter was never offered the position to replace Seifert, even though she was much more experienced than Early. Okay. Let's hear from the other side and you've got a minute. Good morning, Your Honors. May it please the Court, Linda Claxton on behalf of RBC Capital Markets. The issue in this case is whether an employer is able to eliminate the position of an employee during the course of a reduction in force and other cost containment measures while that employee is out, not on a job protected leave, but on a personal leave of absence that has been provided as a reasonable combination to allow her time to heal in order to be able to do the functions of her job. Under the facts of this case, the answer is resoundingly yes. There is no evidence of any discriminatory or retaliatory motive. The only evidence is that Ms. Carter had gone out on a leave. During the time of her protected leave, her position was open and available for her as it had been on her two previous leaves that she had gone out on and had been returned to. During the course of her extended leave, I think we have to keep in mind on what was happening in the national economy and particularly the financial markets. We were facing an economic recession and a financial market collapse. RBC was going through significant cost containment and restructuring during that time. When she was ready to come back, her position had never been filled. Nobody had been hired in to do any of her duties. Her duties had been spread around. And when faced with having to do a headcount reduction and having somebody who is ready to come back to add to your headcount, it was a pure business decision that her position was not needed. Help me out with the sequence involving Early. Ms. Early was actually an existing employee in another department and there had been a series of layoffs and cost containment measures. In the operations department where they have folks who are processing transactions and working in the cage, they had reduced the headcount from four and a half-ish individuals at the time Ms. Carter went out on leave to less than four when she was ready to come back from leave. And nine months later, nine months later after she was ready to come back, Mr. Seifert retired and he was still, the record will show that he was still working far fewer than full-time hours. His hours, he testified his hours had fluctuated the entire time he had been employed. He retired. They did not hire a new employee into that position. They transferred Ms. Early from the other department into that position and did not replace her position. So we still had no change in the support function headcount. When we're talking about the increased headcount of the complex in general, that was primarily the test, the record will show that we had, part of the work was restructuring of the branches within that. So they got additional brokers. And also in order to, this may be individualized for the financial markets, because money was so tight and it was so difficult to get the kind of return they'd gotten before, they were constantly chasing that. And it wasn't that whether the work had increased or not. They had fewer people doing more work, hired more brokers to try and generate more income, and they were using the same number of support staff to support that. So I think what Your Honor pointed out, that this is not an issue of whether she was entitled to reinstatement. This is not a CFRA case. This is an issue of whether she had been provided a reasonable accommodation. There's no dispute that she had been provided the leave in order to heal and come back. The issue is whether the FEHA requires reinstatement to a job that no longer existed that hadn't been filled. And the law clearly is that if an employee is ready to come back, and she testified she didn't need an accommodation due to a job, she's asking for us to recreate her job, which is functionally the same as creating another job or transferring her into a position that she is not qualified to do, which the law clearly does not require. How do you answer your adversary's argument that there is no evidence in the record of a cost containment initiative or anything else to support what you just told us about the circumstances? I would hardly disagree. I think that you have to do a very thorough review of the record to reconcile what is represented as evidence in the brief compared to what is actually in the evidence. Marie Campion, who was the person who was most knowledgeable regarding certain areas, she was also a precipient witness, and the questions fluctuated back and forth. She didn't personally have information on any document related to a freeze or any information related to a freeze. However, both Marty Goldman and Ken Sullivan, and Ken Sullivan was the decision maker, the general manager of the department, clearly testified there was a hiring freeze for support operations, that they had done a number of other layoffs in addition to Ms. Carter's. They continued to do layoffs, continued to do restructuring to try and do more with less. There's absolutely no evidence of any kind of discriminatory motive. Generally what you'll look at, you're not going to get direct evidence. You'll look at circumstantial evidence, what happened around this termination. Clearly her position was not needed because they had been doing it for months and months and continued to do it for months and continue to this day doing it with fewer people. The evidence you look at is what happened afterwards. Has her position ever been filled? No. Has anyone ever been hired to do what she was doing? No. Has the head count increased in that department? No. In fact, it's decreased. All the evidence supports the contention that RBC made this decision purely on the basis of financial crisis that it was facing and it didn't have anything to do with Ms. Carter taking a leave or being on disability. In fact, the company's prior actions in bringing her back to her original position would defy that. Mr. Lyon, you saved some time. Thank you, Your Honor. Ken Sullivan, the person that made the termination decision, said in his deposition at page 47 that there was no payroll freeze, there was no, he never told anyone that there was any, on page 50 I asked him, do you have any information that if Carter had not gone out on leave, she would have been terminated anyway? The answer was no. Said, was there any plan to eliminate Carter's position? No. Did the head count at the Beverly Hills branch decrease at any time quarter to quarter? No. Was there any limitation on the number of employees in the Beverly Hills branch or the branches that were controlled at any time? No. Did it change, did the number of employees fall in any quarter to quarter? No. Year to year, I can't remember. Can you identify any document that would refresh your recollection? A monthly income statement, but they don't show anything indicating that there was any reduction in employees at any time, any limitation on the number of employees. Testimony of Mr. Goldman that you referred to. I'd have to have a page cite. I don't recall that testimony. I don't recall reading that. Do you have any evidence that the head count increased? I do, and I cited in the brief, and I can't remember what it was, but I can tell you that I can't recall exactly where in the transcript it was, but the Beverly Hills branch, in which she was the operations person, added oversight of the Newport Beach branch and two other branches, and I asked, I think it was Pope Ledowski and his depot, who was the head of the Newport Beach branch, and he, I think it was increased by like three people in 2009, but I don't have the exact site in front of me, but it was cited in the brief. There was an overall reduction if you consider all three of the branches. Isn't that correct? I did not think so. I thought that there was an increase in the number. Are you saying if you include people, let go from the lower level branches themselves? I think there might have been some testimony to that effect. I think there was a consolidation, wasn't there? Isn't that what this record shows? There was a consolidation in the Beverly Hill office, so maybe it did go up. I don't know, but total number decreased rather than increased. Now maybe I'm wrong, and if so, tell me. No, but I asked, but the operations section oversees all the checking and the transactions from all the branches. There were three additional branches added to the control of the Beverly Hills branch, so the total number of transactions that had to be handled by the operations section increased greatly, and that was the section that she was in. Okay. Thank you very much. The case of Carter v. RBC Capital Markets submitted for decision.
judges: Korman, Farris, Fletcher